UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO: 3:19-CV-00233-MOC-DCK

| | |
|---|---|
| SIEMENS POSTAL, PARCEL AND AIRPORT LOGISTICS LLC, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) **ORDER** ) |
| Pteris Global (USA) Inc. and Pteris Global Limited, | ) ) ) ) |
| Defendants. | ) |

**THIS MATTER** is before the Court on Siemens' Motion for Preliminary Injunction (Doc. No. 12) against Pteris Global (USA), Inc., and Pteris Global Limited (collectively, "Pteris"). After limited discovery, several rounds of briefing, and a hearing, this matter is ripe for review. For the following reasons, Siemens' motion is denied.

**I.   FACTUAL BACKGROUND**

Siemens and Pteris compete to install, maintain, and operate baggage handling systems in the United States. They also sell components for those systems. This case is about the right to sell one specific component, a high-speed diverter ("HSD"), which efficiently processes customer baggage. Siemens alleges that Pteris is infringing upon its HSD patent, U.S. Reissue Patent No. RE41,360 ("the '360 Patent"), and has thus moved for a preliminary injunction. (Doc. No. 12).

Siemens patented its HSD in 2001 and began selling it shortly thereafter. (Doc. Nos. 13-1 ¶ 4). According to Chris Maness, a Siemens Consulting Product Engineer, the HSD quickly became "industry standard," as it "processed baggage and cargo much more quickly and with much less damage than other sorters." (Id. ¶¶ 4, 7). Despite this success, the HSD is not a commodity;

rather, its market "is limited to projects where airports or airlines refresh or reinstall baggage handling systems." (Doc. No. 13-2 ¶ 11). On average, there are only "[twenty] projects per year seeking bids for new baggage handling systems." (Id.). To increase sales, Siemens sells HSDs to competitors, who then incorporate them into their baggage handling systems. (Doc. No. 13-1 ¶ 9).

Where Siemens successfully contracts to sell a baggage handling system to an airport, it typically installs the system and trains airline employees on how to perform general maintenance. (Id. ¶ 10). Maness averred that this process allows Siemens to "develop[] strong relationships with airline and airport representatives," which in turn "generate[s] future business." (Id. ¶11).

By 2005, Pteris developed its own HSD, which was first sold outside of the United States. (Doc. No. 30-5 ¶ 2). In February 2005, Siemens Dubai purchased a Pteris HSD to install at the Dubai International Airport. (Doc. No. 43-3 at 10). Pteris began domestically installing its HSD in 2010. (Doc. No. 30-5 ¶ 3). Since then, it has installed its HSD throughout the United States—including at the Charlotte Douglas International Airport. (Id. ¶ 6).

In January 2015, Siemens contracted to maintenance the Charlotte Airport's baggage handling system, which was installed by Pteris and which included the Pteris HSD. (Doc. No. 35-1 ¶ 6). To prepare Siemens for this responsibility, Pteris trained the Siemens staff about its baggage handling system. (Id.). Even before the training, Siemens employees had access to the Charlotte Airport baggage handling system, which included the Pteris HSD. (Id.).

Although Siemens has been responsible for maintaining the Charlotte Airport baggage handling system since 2015, Siemens declared "until approximately May 2017, [it] was unaware of any sales or installations of the [Pteris] HSD within the United States." (Doc. No. 43-3 at 13). Siemens admitted it was generally aware that Siemens Dubai purchased a Pteris HSD in 2005, but asserted it was not aware of any domestic sales before 2017. (Doc. No. 43-4 at 9). Siemens

likewise acknowledged that its employees were trained to operate the Pteris system in 2015, but maintained those employees were contract laborers "that do not generally have knowledge about Siemens intellectual property." (Id. at 15).

After Siemens realized that Pteris sold its HSDs domestically, it purportedly "worked to diligently, but thoroughly, investigate the accused HSD." (Id. at 10). In July 2018, Siemens sent a letter demanding that Pteris cease and desist "marketing, selling, providing related servicing, and performing any other activities to violate [Siemens'] rights under [the] '360 Patent." (Doc. No. 38-3). Siemens allegedly "attempt[ed] to resolve the matter without resorting to litigation," but finally filed suit after Pteris engaged in "months of stonewalling." (Doc. No. 35 at 8). After the lawsuit was filed, the parties held a settlement conference, but those negotiations failed. (Id.). Siemens then filed this motion for a preliminary injunction. (Id.).

## II. DISCUSSION

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22–24 (2008). To obtain a preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that the injunction is in the public interest." Id. at 20; see eBay v. MercExchange, 547 U.S. 388, 391 (2006). Where a plaintiff fails to establish one of these four elements, the Court may deny injunctive relief without considering the remaining factors. See Jack Guttman v. Kopykake Enter., 302 F.3d 1352, 1356 (Fed. Cir. 2002).

For purposes of this motion, Siemens contends that Pteris directly and literally infringed on Claim 12 of the '360 Patent. (Doc. Nos. 13 at 6–10, 38 ¶ 36). As such, Siemens moves for the

Court to preliminarily enjoin Pteris and its agents "from infringing, contributing to, and/or inducing infringement of '360 Patent, including but not limited to a prohibition of all making, using, selling, or importing of the Pteris HSD product or any similar product" until August 11, 2020. (Doc. No. 12 at 3). As discussed below, Siemens has failed to show it is likely to succeed at proving direct, literal infringement and has failed to demonstrate it will suffer irreparable harm in the absence of a preliminary injunction. Accordingly, the Court denies Siemens' motion.

A. **Likelihood of Success**

To show a likelihood of success on the merits in a patent infringement suit, a patentee must show "[1] that it will likely prove infringement, and [2] that it will likely withstand challenges, if any, to the validity of the patent." Titan Tire v. Case New Holland, 566 F.3d 1372, 1376 (Fed. Cir. 2009). At the preliminary injunction stage, the Court views these matters "in light of the burdens and presumptions that will inhere at trial." Id.

Siemens contends that Pteris engaged in direct, literal infringement of the patented method protected by Claim 12 of the '360 Patent. Such infringement is a question of fact. See Southwall Techs. v. Cardinal IG, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Direct infringement of a method claim "occurs where all steps of a claimed method are performed by or attributable to a single entity." Akamai Techs. v. Limelight Networks, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc). And to establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." Southwall, 54 F.3d at 1575. Claim 12 protects:

> A method of diverting articles comprising:
>
> conveying articles in a generally horizontal direction at a conveying speed, said conveying including conveying articles on a conveying surface;
>
> positioning a diverting surface at an angle to the direction of travel of an article to horizontally divert the article in a diverting direction; and

4

> driving said diverting surface at a diverting speed greater than said conveying speed wherein a diverted article substantially maintains the same magnitude of speed in the conveying direction when diverted, wherein said diverting surface includes at least two surface portions on opposite sides of said conveying surface which are selectively positionable in a collinear fashion to divert articles.

(Doc. No. 38-1 at 29). Pteris contends that Siemens is unlikely to succeed in proving direct, literal infringement because the sale of a device capable of performing a patented method does not constitute direct infringement as a matter of law. (Doc. No. 30 at 14).[1] The Court agrees.

The Federal Circuit has held that "a party that sells an apparatus capable of performing a patented method is generally not liable for direct infringement if that infringing act comes to pass." Koninklijke Philips N.V. v. Zoll Med. Corp., 656 F. App'x 504, 521 (Fed. Cir. 2016) (citing Moba, B.V. v. Diamond Automation, 325 F.3d 1306, 1313 (Fed. Cir. 2003)). "Instead, the direct infringer would be the party who put that apparatus to use to perform the patented method." Id. (citing Ericsson v. D-Link Sys., 773 F.3d 1201, 1221 (Fed. Cir. 2014)).

Recognizing this holding, Siemens nevertheless contends that a seller directly infringes a patent by selling a product that "automatically" performs a patented method "according to its standard programming, setup, or installation." (Doc. No. 35 at 3). To support this argument, Siemens relies on SiRF Technology v. International Trade Commission, 601 F.3d 1319 (Fed. Cir. 2010). In SiRF, the Federal Circuit affirmed the International Trade Commission's finding that the manufacturer of GPS Systems directly infringed on an asserted method claim. Id. at 1331. Some of the method steps were executed by a satellite, which was controlled by the manufacturer. See id. The remaining steps were then automatically performed by the manufacturer's GPS products, which were in the possession of the manufacturer's customers. Id. at 1329–30. On these

---

[1] Pteris raises several additional arguments as to why Siemens is unlikely to succeed on the merits, but the Court declines to address them at this time. See Goodman, 302 F.3d at 1356.

facts, the Court concluded that the manufacturer performed all the protected steps required for direct infringement, not the customers who possessed the GPS products. See id. at 1331.

The Federal Circuit later clarified the scope of SiRF in Ericsson v. D-Link Systems, 773 F.3d at 1221. Below, in reliance on SiRF, a "district court reasoned that, because the accused products performed the claimed method when operated by [the accused]'s customers without any modification, a finding of direct infringement was justified." Id. at 1220. The Court disagreed, explaining that "SiRF did not create direct infringement liability whenever an alleged infringer sells a product that is capable of executing the infringing method." Id. at 1221. Moreover, the Court emphasized that "none of [its] decisions have found direct infringement of a method claim by sales of an end user product which performs the entire method" and "which is controlled by a third party." Id. Accordingly, because the patentee could not "point to any evidence in the record that [the accused] performed the infringing steps, or that any of its customers were under its direction or control, [there was no] evidence to find direct infringement." Id.; see Koninklijke, 656 F. App'x at 521 (declining again "to extend the scope of direct infringement" to devices which "automatically perform the [patented] method . . . upon sale to [the accused's] customer").

Here, Siemens asserts that Pteris directly infringed Claim 12 by selling a "copycat HSD [that] performs all [method] steps right out of the box and without requiring any modification by Pteris' customers or end users." (Doc. No. 35 at 3). But under Ericsson, what is relevant here "is not whether [Pteris] supplied an [HSD] that can perform each step of a claimed method. What is relevant is whether [Pteris] [supplied an HSD] programmed to perform at least one step [and] may be said to have performed or controlled any others." Adaptix v. Apple, 78 F. Supp. 3d 952, 957 (N.D. Cal. 2015) (emphasis added); see Koninklijke, 656 F. App'x at 521 (holding direct infringement was not shown where devices were "wholly out of control of [the seller]"); Ericsson,

773 F.3d at 1222 (same); Wi-LAN v. Sharp Elecs., 362 F. Supp. 3d 226, 235 (D. Del. 2019) (same); see also Akami, 797 F.3d at 1023 (recognizing an entity is responsible for others' infringement when it "directs or controls others' performance"). Because Siemens failed to show that Pteris performed or controlled the infringing actions following the sale, Siemens is unlikely to succeed on the merits on a direct infringement claim.[2]

**B.     Irreparable Harm**

Even if Siemens was likely to succeed in providing direct, literal infringement of Claim 12, the Court would nevertheless deny its motion because Siemens failed to clearly show that it is likely to suffer irreparable harm absent a preliminary injunction. Siemens principally asserts four sources of irreparable harm: (1) loss of sales; (2) difficulties with enforcing the judgment against Pteris Global, a foreign corporation; (3) loss of brand distinctiveness and reputation; and (4) loss of customer good will and relationships. (Doc. No. 13 at 10–15). As discussed below, Siemens' allegations are insufficient to demonstrate irreparable harm.

It is well-established that "[e]vidence of potential lost sales alone does not demonstrate irreparable harm." Metalcraft of Mayville v. The Toro Co., 848 F.3d 1358, 1368 (Fed. Cir. 2017). Rather, the movant must show "money damages [are not] calculable, and therefore the harm cannot be adequately compensated[.]" Id.; see Sampson v. Murray, 415 U.S. 61, 90 (1974) ("The

---

[2] Siemens' complaint also includes allegations of indirect, contributory, and induced infringement, but those allegations were not substantiated with evidence or argument for purposes of this motion. (Doc. Nos. 13, 35, 43). As a result, Siemens failed to make a clear showing that it is likely to succeed on the merits under these infringement theories. See Winter, 555 U.S. at 22. Similarly, in response to Ericsson, Siemens alternatively asserts that Pteris "should be enjoined from any use of HSD in the United States through testing, maintenance, or otherwise." (Doc. No. 35 at 4). But Siemens' allegations of irreparable harm were tied to the sale of the Pteris HSD, not Pteris's use. Siemens thus failed to show it is likely to suffer irreparable harm from such use.

7

possibility that adequate compensatory or other corrective relief will be available at a later day, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Here, Siemens asserts that damages are incalculable and inadequate because the "market for high speed baggage diverters is significantly limited, as those products are sold only to airports and airlines looking to replace or refresh their baggage handling systems." (Doc. No. 13 at 11). Moreover, Siemens contends its HSD sets the "industry standard" and thus "drive[s] sales." (Doc. No. 35 at 9). Even assuming Siemens is correct, courts have devised several reliable methods to calculate damages for such multi-component products, which include both infringing and non-infringing components. See, e.g., Power Integrations v. Fairchild Semiconductor Int'l, 904 F.3d 965, 977 (Fed. Cir. 2018) (recognizing a patentee is generally entitled "to a reasonable royalty attributable to the infringing features," but that a patentee may recover the "value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand"), cert. denied, 139 S. Ct. 1265 (2019).[3]

Siemens next contends it will suffer irreparable harm because Pteris Global is "a Singapore company" and thus Siemens "may likely encounter difficulties in enforcing any money judgment." (Doc. No. 13 at 14). To be sure, a movant may demonstrate irreparable harm "based on barriers to collectability after a judgment." SAS Inst. v. World Programming, 874 F.3d 370, 387 (4th Cir. 2017), cert. denied, 139 S. Ct. 67 (2018). But here, Siemens has only offered vague allegations that Pteris Global is "foreign" and thus there may be "difficulties" with collecting a judgment. Such opaque assertions are insufficient to justify the strong medicine of injunctive relief. See id;

---

[3] Siemens also asserts it will suffer irreparable harm absent an injunction because there is an "extremely limited post-litigation period to enjoy it rights." (Doc. No. 13 at 14). For reasons discussed above, the Court finds that money damages are calculable and adequate for any injury that Siemens might suffer as a result of this litigation.

8

cf. Winter, 555 U.S. at 21 (recognizing a movant "must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief" (emphases added)).

Finally, Siemens asserts that Pteris's infringement undermines its brand distinctiveness and reputation, as well as its customer good will and relationships. A clear showing that such harms are likely would support issuing a preliminary injunction. See Metalcraft, 848 F.3d at 1368; Douglas Dynamics v. Buyers Prod., 717 F.3d 1336, 1343 (Fed. Cir. 2013). But Siemens has failed to make that showing here. As to reputation, Siemens submitted an affidavit from Andrew Savage, its Vice President of Airport Logistics, which declared that the Pteris HSD is "indistinguishable from the Siemens HSD," so "[a]ny performance problems or functional issues with the Pteris HSD are likely to be attributed to Siemens." (Doc. No. 13-2 at 3). But Siemens has failed to identify a single instance of customer confusion or of performance problems that might be attributed to Siemens. Similarly, as to good will, Siemens submitted an affidavit from Chris Maness, its Consulting Product Engineer, which summarily stated that the sale and installation of baggage handling systems generates "relationships and . . . related goodwill," which in turn "generate[s] future business for Siemens." (Doc. No. 13-1 ¶ 11). Again, Siemens has failed to identify a single instance where customer goodwill generated future business.[4] By failing to include such critical evidence, Siemens has failed to make a clear showing that it is likely to suffer irreparable harm. See Winter, 555 U.S. at 21; see also Siegel Oil v. Richardson, 208 F.3d 1366, 1374 (Fed. Cir. 2000) (rejecting as insufficient an affidavit presenting "conclusory statements of injury" without "factual and quantitative support and [without] references to supporting documentation").

---

[4] In fact, the parties' evidence suggests that the total contract price for baggage handling systems—not customer good will—drives future business. (Doc. Nos. 13-2 ¶ 9, 30-5 ¶ 14).

9

As a final death knell, the Court finds that Siemens' allegations of irreparable harm are discredited by the fact it waited <u>years</u> to file this preliminary injunction motion. Since 2015, Siemens has maintained the Charlotte Airport baggage handling systems, which includes Pteris HSDs. (Doc. No. 43-5). Still, Siemens purportedly failed to discover that infringing HSDs were installed in the United States until May 2017—almost two years later. (Doc. No. 43-3). This failure is incredulous, particularly because Siemens was aware that Pteris sold such HSDs abroad since 2005. After discovering the infringing HSD, Siemens waited until July 2018 to send Pteris a cease-and-desist letter. (Doc. No. 38-3). These substantial periods of undue delay materially undermine Siemens' allegations of irreparable harm. See <u>Apple v. Samsung Elecs.</u>, 678 F.3d 1314, 1326 (Fed. Cir. 2012); <u>Nutrition 21 v. United States</u>, 930 F.2d 867, 872 (Fed. Cir. 1991) (recognizing that "delaying for a substantial period of time before seeking a preliminary injunction at least suggests that the status quo does not irreparably damage [the movant]").[5]

## III. CONCLUSION

For the foregoing reasons, Siemens has failed to clearly show that it is likely to succeed on the merits and that it is likely to suffer irreparable harm in the absence of injunctive relief. Because Siemens has failed to make the requisite showing, the Court denies Siemens' Motion for Preliminary Injunction.

---

[5] The Court acknowledges Siemens might have "diligently followed up with Pteris [after the cease-and-desist letter] in an attempt to resolve the matter without resorting to litigation." (Doc No. 35 at 8). Still, the Court finds that the delay <u>before</u> sending the letter was unreasonable.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Siemens' Motion for Preliminary Injunction (Doc. No. 12) is **DENIED.**

Signed: November 20, 2019

Max O. Cogburn Jr
United States District Judge